[No. 27342. Department Two. July 14, 1939.]

HELEN DAVIS, *a Minor, by F. E. Davis, her Guardian ad Litem, Respondent,* v. HAROLD R. PINKERTON *et al., Appellants.*[1]

[1]Reported in 92 P. (2d) 706.

*Snively & Bounds* and *Owen Clarke,* for appellants.

*Cheney & Hutcheson* and *Walter J. Robinson, Jr.,* for respondent.

ROBINSON, J.—On October 2, 1937, shortly after five p. m., Helen Davis, a minor, then not quite eighteen years of age, was struck by an automobile driven by Harold R. Pinkerton while she was attempting to walk or run across Tieton drive, a paved arterial highway, running in a general easterly direction into the city of Yakima. In this action, brought on her behalf by her guardian *ad litem,* she received a jury verdict. The usual post-trial motions were made and denied, and judgment entered, from which this appeal was taken.

The accident occurred at a point several blocks west of the city limits. At this point, there are but few houses along the highway, and no cross-roads, although two public roads and a private driveway enter the highway from the north. There are no cross-walks, nor any provision for pedestrian traffic. The ordinary traffic to the eastward, as Miss Davis knew, was greatly augmented at that particular time of day by the fact that the employees of several fruit packing plants, located west of the city, were then returning to the city after completing the day's work at five o'clock. She herself had just come from one of those plants.

The appellants contend that no case was made for the jury as to Pinkerton's negligence, and that it clearly appeared that Miss Davis was negligent as a matter of law. Nineteen witnesses testified, and there is less conflict in their evidence than might be expected.

Mr. Pinkerton testified, in substance, that he had

overtaken, and was about to pass, a truck loaded with apple boxes, either proceeding very slowly or altogether stopped, when Miss Davis suddenly appeared in front of it, about six feet from the southerly margin of the pavement, with the evident intention of crossing. He was then about twenty-five feet from her. He blew his horn, put on his brakes, and swung to the left. Miss Davis continued to run across the road, looking toward the east instead of in his direction. As he got to the north edge of the pavement, with his left front wheels off in the gravel, Miss Davis ran into the right front fender of his car, which traveled but a few feet after the impact. He estimated that he was making thirty miles per hour when he crossed Highland drive, which, according to the scale map in evidence, is about one hundred and thirty feet from the point of impact. At the time he first saw Miss Davis, he was driving twenty-five miles per hour, and not more than ten or twelve miles at the time of collision. His car traveled but a few feet after he struck her.

There is a great deal of evidence in the record which corroborates Mr. Pinkerton, and some which contradicts him. Ralph Warren, who was following the truck in his car, testified that, when Miss Davis came out from in front of the truck, the Pinkerton car was fifty to seventy-five feet west of the point of impact. T. A. Weiss, who was riding in his brother's car, which was following the Warren car and was about one hundred and fifty feet west of the point of impact when it occurred, testified that, when Miss Davis came out from in front of the truck, the Pinkerton car was forty or fifty feet from her. Both of these witnesses testified that Pinkerton was traveling around fifty miles per hour just prior to the time Miss Davis appeared in the road. There is evidence, however, although given by a witness who was not in a good position to form an accurate

judgment, that Pinkerton was traveling about sixty miles per hour, and not less than five witnesses testified that the car left rubber or skid marks on the paved surface of the road, running back from where it stopped, for a distance of from fifty to sixty-three feet.

It is not disputed that the four-wheel hydraulic brakes of the Pinkerton car were in excellent condition, and Pinkerton himself testified that, at the time, his tires were in good shape; that the highway was dry; and that, under those conditions, he could bring the car to a dead stop, from a speed of twenty-five miles, in a distance of from fifteen to eighteen feet. As all the witnesses are agreed that he set his brakes, and the physical evidence proves that beyond question, it would seem likely that he was traveling a great deal faster than twenty-five or thirty miles per hour.

■ Was Pinkerton driving at a negligent speed? That question could not be decided, as a matter of law, without knowing, among other things, at what speed he was driving. As to that, as we have seen, there was conflict in the evidence requiring consideration of the credibility of various witnesses. The question of defendant's negligence was, therefore, necessarily for the jury.

■ We come now to the matter of the alleged negligence of Miss Davis. She had just gotten out of a car driven from the west by Mrs. Phyllis Carter, who had driven partly off the south edge of the pavement in order to permit Miss Davis to alight across the road from the Persons' house, where she was then living with her sister. Close behind the Carter car, a truck, going in the same direction, was just coming to a stop, with its right wheels off the pavement. The truck had a body ten or twelve feet in width, and was loaded with one hundred boxes of apples, in ranks about six feet high. Following it, at a little distance, was a car driven

by Ralph Warren, and not far behind that another driven by A. B. Weiss. All these cars were traveling east.

Pinkerton, also going in that direction in the north lane, had already passed the Weiss car and was overtaking, or passing, the Warren car when Miss Davis started to cross the road. Miss Davis must have started across the road in front of all this traffic immediately after she got out of the Carter car, for Mrs. Carter testified that she had scarcely gotten under way when she heard what she described as the squealing of brakes from the rear. There were two other women passengers in the Carter car. When they heard the squealing of brakes, Mrs. Carter testified: "We all hollered, 'Watch out, Helen!' " This was corroborated by one of the women passengers in the Carter car and by Mrs. Carter's father, who was also a passenger. Mrs. Carter glanced at her rear vision mirror, then at the car ahead, and then at the mirror again, and saw Miss Davis in the air and on the right front fender of the Pinkerton car. She stopped her car not much more than a car-length ahead of where Miss Davis lay on the pavement.

That Miss Davis started to cross the road very quickly after alighting from the Carter car, is also shown by the evidence given by one of her witnesses, Robert Keep. He was also driving east and passed the Carter car just as Miss Davis alighted and closed the door. He was going thirty miles per hour; yet, according to his evidence, he had not traveled more than fifty or sixty feet when he happened to look back and saw the Pinkerton car strike Miss Davis about six feet from the north edge of the pavement.

As hereinbefore stated, Mr. Pinkerton testified that Miss Davis came out in front of the truck, running diagonally in his direction. His wife, who sat in the front seat with him, so testified. Mrs. Scott, who was

riding with the Pinkertons, so testified. Several disinterested witnesses, who were called on behalf of Miss Davis, testified substantially to the same effect. Sanislo, the truck driver, said she passed in front of his truck until she reached the middle of the pavement, then seemed to become confused, "started to kind of step back and then she makes a quick run." Warren, driving the car next behind the truck, said: "She kind of went in kind of a trot." Under cross-examination, he said she was "running." T. A. Weiss was with his brother in the car following Warren, and about one hundred and fifty feet back from the point of impact. He said Miss Davis was struck when about four feet from the north edge of the pavement; that she was moving pretty fast. He could not remember whether she was running or only walking fast. A. B. Weiss, who was driving that car, testified, in part, as follows:

"Q. Then where was she when you next noticed her? A. Just north of the — about the middle of the pavement, crossing the road. Q. Just go ahead and tell the jury what you saw. ·A. I saw her there, running across the pavement north of the truck, ahead of it, and then, there for an instant, I didn't see her in front of the Pinkerton car until she was rolling over on the pavement."

Raymond Reeves, a passenger in the Weiss car, was equally definite:

"Q. You did notice her, didn't you? A. I noticed her after I heard the tires on the pavement, not until then. Q. What was she doing then? A. She was running across the pavement."

He further testified that she was struck about four or five feet from the north edge. Miss Davis testified, on her own behalf, as follows:

"I got out and walked around the side of the car and I looked to the west. There was just this truck, but it looked like he was stopped to me and he motioned for me to go ahead, he nodded his head. I

started across. I got about half-way across, I guess, when I turned around and looked again. I looked to the east; when I looked to the west—I walked a little farther, glanced up to the west, and I saw this car coming."

This evidence is subject to the interpretation that she looked to the east when she reached the center of the roadway and did not look to the west until after she had passed that point, and strength is lent to this interpretation by the evidence which immediately follows it:

"Where were you when you say you first saw the Pinkerton car? A. The first time I saw the Pinkerton car was when I was nearly across, about three feet from the north side of the pavement."

A little later in the progress of the examination, she testified:

"Q. And where were you at that time when you first saw the Pinkerton car? A. I was about three feet from the north edge of the pavement."

She said, however, later in the examination, that she looked to the west when "I was in the center of the pavement or just a little past."

"Q. You could see around the truck then, could you? A. Yes. Q. Did you see any traffic then other than the truck? A. No, I didn't. Q. Then did you walk or run across the pavement? A. I walked. Q. Straight across or diagonally? A. Diagonally. Q. That is a little bit which way? A. Northwest. Q. Was that very much different than straight across would be? A. No."

On cross-examination, she testified, in part, as follows:

"Q. Now, when you passed the front of the truck, you were out on the pavement, were you not? A. Did you say when I passed? Q. When you got out in front so you could see both ways, you were then on the pave-

ment? A. You mean so I could see both ways? Q. Yes. A. Well, yes. Q. That is, the truck, that truck with the big bed on it, obstructed your view to the west? A. Until I got in the center of the highway. Q. Did you have to go clear to the center before you could see? A. It was just about the center, yes. Q. And then how far after that, how far had you gone after that before the accident happened. A. Well, I was nearly across, I was only three feet from the edge of the pavement. Q. If that is an eighteen foot pavement—you say you were about in the center when you got past the truck so you could see both ways? A. Yes. Q. And were about three or four feet from the north edge when it happened? A. Yes. Q. Then you had gone about five feet; is that right? A. I guess so. Q. If I'm not, you just argue with me. Then, after you passed the truck, when you were about in the center and while you were going that five feet, didn't you look to the left. A. Yes, I did. Q. And you never saw anything? A. No, I didn't. Q. Where do you suppose those—there were three cars, weren't there, Miss Helen, the Pinkerton car, the Weiss car and the Warren car? A. They weren't in that lane of traffic. Q. Did you see them at all? A. No, I didn't. Q. You didn't? A. I don't remember seeing those cars. Q. You don't remember seeing anything but the truck? A. I saw the truck, yes. Q. And that is all? A. Yes. Q. That's a perfectly straight road, isn't it? A. Yes."

It is earnestly contended by respondent's counsel that the contributory negligence phase of the case at bar is conclusively governed by our recent decision in *Kellum v. Rounds,* 195 Wash. 518, 81 P. (2d) 783, in which it was held that a boy who came out into the path of an oncoming car from in front of a standing school bus could not be held guilty of contributory negligence as a matter of law. It is apparent from the opinion in that case that the court not only regarded it as being on the border line, but also that the facts

are sharply distinguishable from the facts in this case. We quote a portion of that opinion:

"In this case, the plaintiff testified that he looked and gives some explanation, although a none too satisfactory one, for his failure to see the Rounds' car. He had ridden on the school bus every school day from November, 1936, to May 14, 1937, the day of the accident. He knew that other traffic stopped while school busses were discharging passengers, and therefore had some reason to expect that for the moment his path across the roadway would be clear. And finally, he was but fourteen years and five months of age, and was, therefore, not necessarily held to the same amount of care that an adult would be. We think that these three circumstances in combination made the question of his contributory negligence so far debatable that reasonable men might well differ concerning it."

Young Kellum gave some explanation for his failure to see the oncoming car. Miss Davis gave none. Kellum had a good reason to suppose that his path across the roadway would be clear. Miss Davis had none. Kellum was but fourteen years and five months of age, while Miss Davis had attained the age of seventeen years and ten months.

Upon her own evidence, Miss Davis must be held to have been guilty of contributory negligence, as a matter of law, upon the authority of *Hamblet v. Soderburg,* 189 Wash. 449, 65 P. (2d) 1267, and in accordance with the principles therein discussed. In that case, Mrs. Hamblet was standing at a street intersection waiting for a bus. It drew up to the corner, blocking her view of any car which might be closely following it and about to pass. Some neighbors appeared in their automobile on the other side of the street and invited her, by gestures, to ride down town with them. Without looking or attempting to discover whether any car was approaching from behind the bus, she crossed in

front of it into the street and was killed. The court said, in part:

"Present day traffic upon our streets and highways is of such a nature that the duty of reasonable care, which rests upon all, requires, in almost any conceivable situation, a fairly efficient attempt at observation before a pedestrian steps into the path of vehicular traffic.

"Where, as here, no attempt at observation is made and especially where one steps out from behind an obscuring object, the pedestrian is guilty of negligence as a matter of law.

"This conclusion seems to be self-evident, but reference may be had to the following of our cases, which, in principle at least, sustain our present holding. *Jones v. Seattle*, 144 Wash. 188, 257 Pac. 393; *Gottstein v. Daly*, 166 Wash. 582, 7 P. (2d) 610.

"Even had there been testimony that Mrs. Hamblet had looked but did not see the approaching automobile, still there could have been no recovery. *Silverstein v. Adams*, 134 Wash. 430, 235 Pac. 784; *Steinheim v. Nicholas*, 171 Wash. 614, 18 P. (2d) 836."

Miss Davis twice testified, categorically, that she did not see the Pinkerton car until she was about three feet from the north side of the pavement. That was where she was struck. But the testimony of all the witnesses, and her own testimony, is to the effect that she could have seen it when she arrived at the center line of the road. There can be no question whatever but that, at that time, it was coming straight down the north lane of the highway. Later, it is true, she said she looked to the west when she was a little past the center of the highway, but saw no car. But this does not strengthen her position; for, since it was there, the law charges her with seeing it, and it was so close that it was clearly dangerous to attempt to cross in front of it.

We do not know, in feet, how far distant that car

was, nor at what speed it was traveling; but we do know, and from her own evidence, that it was so close, and coming so fast, that she was able to proceed no more than five or six feet at the very most, that is, three short steps, until it struck her, and this, although the driver set his brakes and veered to the north. Had he not veered from the normal, straight course he was then pursuing, she would have been able to take but two steps before the car struck her. The conclusion is unescapable that Miss Davis was negligent in attempting to cross the north lane without looking to see if a car was approaching from the west.

We gather from statements of the trial judge appearing in the record that he refused to take the case from the jury and refused to grant the appellants' motion for judgment notwithstanding the verdict, upon the theory that it was for the jury to determine whether or not Miss Davis exercised due care in deciding whether she had time to safely cross in front of the Pinkerton car. But there was no such question as that in the case. We re-quote portions of Miss Davis' evidence given on her direct examination:

"Q. Where were you when you say you first saw the Pinkerton car? A. The first time I saw the Pinkerton car was when I was nearly across, about three feet from the north side of the pavement." (St. 203)

"Well, I just looked up and his car—was right on me." (St. 204)

"Q. And where were you at that time when you first saw the Pinkerton car? A. I was about three feet from the north edge of the pavement." (St. 205)

"Q. Now, at the time of the impact, when you were hit, how far were you from the north edge of the pavement? A. About three feet." (St. 206)

In our opinion, this evidence, the respondent's own evidence, when considered with other proven and wholly undisputed facts, conclusively establishes her

contributory negligence. That the Pinkerton car was coming straight down the north lane of the highway when she reached the center line, is shown by the testimony of eight witnesses and disputed by none. It is also conclusively shown by the skid marks and other well-established physical conditions. Miss Davis herself testified that she could have seen past the truck straight down the north lane when she reached the center of the highway. Obviously, she could not have failed to see the oncoming car before she stepped directly into its path,—*if she had looked*. She did not see it. Therefore, *she did not look*.

"Where, as here, no attempt at observation is made and especially where one steps out from behind an obscuring object, the pedestrian is guilty of negligence as a matter of law.

"This conclusion seems to be self-evident." *Hamblet v. Soderburg, supra*.

The judgment appealed from is reversed, and the cause is ordered dismissed.

BEALS, STEINERT, GERAGHTY, and SIMPSON, JJ., concur.